UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES D. ABDELLA, JR., Individually and as the parent and next friend of his daughter, REGINA ABDELLA and ROSEMARY ABDELLA. | : : : : | CASE NO.   3:01CV1686 (DJS) |
| Plaintiff | : | |
| | : | |
| - v - | : | |
| | : | |
| CHRISTOPHER P. O'TOOLE, CARL E. ROSA, ROBERT F. BETTE and JOSEPH FROEHLICH | : : : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

James Abdella, Jr. ("James") and his wife Rosemary Abdella ("Rosemary") bring this action, as individuals and on behalf of their daughter Regina Abdella ("Regina"), for compensatory and punitive damages arising out of an allegedly unconstitutional entry and search of the Abdella home on July 18, 2001. Defendants Christopher O'Toole ("O'Toole") and Robert Bette ("Bette") are police officers employed by the town of Southbury, Connecticut. Defendant Joseph Froehlich ("Froehlich") is a sergeant with the Connecticut State Police serving as the resident state trooper for Southbury. Froehlich was the direct supervisor of O'Toole and Bette during the course of events underlying this suit. O'Toole and Bette have motioned for summary judgment on the grounds that there is no constitutional violation and, regardless, that they are entitled to qualified immunity. Sergeant Froehlich has motioned for summary judgment on the same grounds. The court, for the following reasons, **GRANTS in part** Froehlich's motion for summary judgment **[doc. #42]**. O'Toole's and Bette's motion **[doc. #38]** is also **GRANTED in part**.

**FACTS**

Certain general facts in this case are not disputed. On July 18, 2001, Officer

Christopher O'Toole responded to a report that young men had stolen some cases of beer from

a Budweiser delivery truck. State Trooper Joseph Froehlich also investigated the alleged

crime. O'Toole's search for the alleged thieves led him to a vehicle operated by Thomas

Boiano. He learned from Boiano that James Abdella ("Jim"), son of the plaintiff, had been a

passenger in the vehicle and that Boiano had recently dropped Jim off at the Abdella

residence, 198 South Britain Road, Southbury. O'Toole proceeded to the Abdella residence,

searching for Jim. O'Toole did not have a search warrant, and this was a fact known to all

defendants throughout these events.

O'Toole arrived at the Abdella home alone, went to a door and knocked. Regina, the

eleven-year old daughter of James and Rosemary, answered the door. Officer O'Toole

observed that Regina was approximately 10 years of age and asked her if her parents were at

home. She answered no. Officer Bette and other officers then began to arrive at the home. At

this point, the parties' accounts diverge significantly.

All parties admit that Officer O'Toole asked Regina if Jim was at home. According to

defendants, Regina responded that Jim was around. Plaintiffs contend that Regina told the

officers that he was not in the house. O'Toole states that he asked Regina for permission to

enter the home and she said yes. O'Toole then entered the home, accompanied by Froehlich

and Bette.

There is a factual dispute about which defendants were present when O'Toole entered

the Abdella home. O'Toole testifies that Froehlich was with him when he asked Regina if he

could enter, and that Froehlich entered with him. Froehlich contends that he entered only

when he saw O'Toole and Bette standing in the house talking to Regina, and O'Toole "waived

him inside." Bette states in his affidavit that he was instructed by Froehlich to search the exterior of the house, and that he entered the home via the kitchen when he had completed his assignment. It is not clear from defendants' facts if Bette entered the home with O'Toole and Froehlich.

Froehlich instructed Bette to search outside for Jim. O'Toole and Froehlich stayed with Regina during Bette's search. Bette entered the kitchen, where O'Toole was then standing with Regina. Bette and O'Toole asked Regina if there was an adult or older sibling she could call, and she called her sixteen-year old sister, Leandra. Officer Bette spoke to Leandra via phone. Froehlich asked Regina if she was certain her brother was not home, since she had said he was "just there" before the police arrived. O'Toole then asked Regina's permission to search the second floor for Jim. Regina responded "I don't care." Froehlich and O'Toole conducted a quick search of the second floor, but did not find Jim. Froehlich admits that some closets were opened in the search, but O'Toole makes no mention of similar actions. The police left the residence shortly after Leandra arrived. Regina stayed with her sister.

Plaintiffs paint a quite different picture. Officer O'Toole, after hearing that Jim was not at home, asked Regina to look for her brother. She first searched the second floor of the home and then returned to tell O'Toole that she had not found Jim. O'Toole then asked her to search the garage attached to the house. While Regina was searching the garage, O'Toole entered the Abdella home and stood near the door. Upon Regina's return, O'Toole moved further into the home and stood with Regina while Bette entered behind him. Regina did not see Froehlich enter the home. Regina, surrounded by three police officers, told O'Toole she didn't care if he looked around the house. O'Toole and Froehlich then undertook to

thoroughly search the entire house. Drawers, closets and closed rooms were entered, searched and left in disarray. Officer Bette did help Regina call her sister, and police did leave when Leandra arrived. No beer was found and Jim was not discovered in the residence.

The Abdella family further claims that, after the event, they suffered emotional trauma and social ostracization. Rosemary alleges that she is suspicious, defensive and distraught and that she no longer feels safe within her home. Regina testified that as a result of this incident she has lost her faith and trust in the police, a fact the defendants admit. Plaintiffs do not claim that any member of the Abdella family was physically injured as a result of the defendants' actions.

## DISCUSSION

The pending motions for summary judgment raise essentially identical issues. O'Toole and Bette have filed their motion jointly and they will be treated accordingly. Once the merits of O'Toole's and Bette's motion have been addressed, the merits of Froehlich's arguments will be considered. Qualified immunity will be discussed in the final section, first as it applies to O'Toole and Bette and then as it applies to Froehlich.

## I.    STANDARD OF REVIEW

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it]

has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" <u>American Int'l Group, Inc. v. London Am. Int'l Corp.</u>, 664 F.2d 348, 351 (2d Cir. 1981) (quoting <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir. 1992) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. <u>See</u> <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." <u>Id</u>.


## II.    MOTION OF DEFENDANTS O'TOOLE AND BETTE

### a.    Consent

Defendants, Officer O'Toole and Officer Bette, claim that they received consent from Regina, both to enter the Abdella home and to search the home once the officers had gained entry. The consent, defendants argue, validates their warrantless search.

A warrantless search is *per se* unreasonable under the Fourth Amendment. <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967); <u>Koch v. Town of Brattleboro</u>, 287 F.3d 162, 166 (2d Cir. 2002). There are limited exceptions to this rule. A warrantless search may be justified on the grounds of "hot pursuit," or as an incident to an arrest or where an individual consents to the search. <u>Katz</u>, 389 U.S. at 358. Only consent is at issue in the present action.

Two separate search and seizure questions are raised. First, defendants contend that they had consent to enter the Abdella home. Second, they argue that Regina gave them consent to search the second floor of the Abdella home. There is a direct and obvious issue of fact regarding Regina's alleged consent to enter the Abdella home. Regina testifies that she was not asked for, and did not give, her consent but rather that Officer O'Toole entered the Abdella home of his own accord and without permission. The court cannot grant summary judgment to the defendant on the question of unlawful entry.

The search of the second floor of the Abdella home was arguably undertaken with consent. There is no dispute of fact regarding either O'Toole's request for permission or Regina's response. It is also undisputed that Regina was not the owner of the property searched by police. The court, therefore, must address the issues of third-party authority to consent and voluntariness as they relate to the search of the second floor.

A consent to search property may be obtained from the owner of the searched property. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). Alternately, the police may receive consent from a third-party who "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). "[F]irst, the third-party must have access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992). Common authority rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection…and that the others have assumed the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 172.

–6–

It is also possible for the police to rely on the apparent authority of a third-party to justify a warrantless search. When the police are mistaken as to the actual authority of a third-party to grant consent, the entry will not be constitutionally unreasonable if the officers' belief in the legal capacity of the third-party to give consent is reasonable. Rodriguez, 497 U.S. at 186. Rodriguez does not, however, validate a search based on an erroneous view of the law. United States v. Brown, 961 F.2d 1039, 1041 (2d Cir. 1992).

Consent must be freely and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Voluntariness is a fact to be determined from the totality of all the circumstances. Schneckloth, 412 U.S. at 227. Consent is not demonstrated merely by a showing of acquiescence to a claim of lawful authority. Id. at 233; see also, United States v. Ruiz-Estrella, 481 F.2d 723, 727 (2d.Cir. 1973).

Defendants raise Regina's consent to the second floor search as a defense to claims that the search was unconstitutional. The court assumes, arguendo, that Regina's statement that she did not care if the police looked around could have properly been interpreted as consent. Once consent is established, it remains to be determined that the consenting third-party had the necessary authority to consent and that the consent was voluntary. Absent actual authority to consent, the search will still pass constitutional muster if the police were reasonable in assuming that the consenting party had the necessary authority.

Courts have repeatedly held that the threshold inquiry in finding the common authority necessary for actual third-party authority to consent to a warrantless search of property is whether the owner, co-owner or co-inhabitant of the property has assumed the risk that the third-party will permit the property to be searched. Matlock, 415 U.S. at 172; Davis, 967 F.2d at 88; United States v. Chaidez, 919, F.2d 1193, 1202 (7th Cir. 1990)("The underpinning of

third-party consent is assumption of risk."). There is no basis, on the facts presented here, to conclude that the Abdellas assumed the risk that their eleven-year old daughter would permit the police to search their home or personal property.

There is an ongoing discussion in the courts over whether a minor ever has authority to give third-party consent to a search of a parent's property. Although neither the Second Circuit nor the United States Supreme Court has ruled directly on this issue, a distinct consensus has emerged. It is clear that there is no *per se* rule that all minors lack the authority to consent to a search. Typically, the minority of the consenting party will be merely one of many factors considered when a fact-finder decides the voluntariness of the consent.

This court accepts and adopts the general rule that minority does not *per se* preclude a factual finding of actual or apparent authority. The authority of all minors to consent is not, however, equal. A ten-year old girl possesses a very different level of maturity and can be expected to have a very different level of authority regarding the home than a seventeen-year old young woman. "As a child advances in age, she acquires greater discretion to admit visitors on her own authority. In some circumstances, a teenager may possess sufficient authority to allow the police to enter and look about common areas." People v. Jacobs, 43 Cal.3d 472, 483 (Cal. 1987) (Holding that an eleven-year old child is too young to give consent to police where police lacked a reasonable basis for their entry into a home under California law). This level of maturity and responsibility directly impacts the question of actual or apparent authority. The vast majority of courts, federal and state, to hold that a child under twelve had actual authority to consent to a police search of their parent's property did so under factual circumstances very different than those presented here. Typically, an adult is present, or the child has contacted police and requested the search, or the child is a victim of,

or witness to, the crime that led to the search.[1] None of those factors is found in this action.

One federal court has concluded that minority may never be a factor in finding third-party authority to consent. The Eleventh Circuit held in Lenz v. Winburn that a nine-year old girl could give consent to her guardian ad litem to enter the home she shared with her grandparents and retrieve some of the child's own belongings. Lenz v. Winburn, 51 F.3d 1540, 1543 (11th Cir. 1995). The Lenz court reasoned that there were four reasons why a minor could always have actual authority to give consent to a search. First, "privacy is not an intuitive interest, and legal sophistication is not required even for adults to give valid consent." Lenz, 51 F.3d at 1548. Second, the vulnerability of a minor to coercion by authority figures is part of the inquiry into voluntariness and does not impact authority. Id. at 1549. Third, consent searches are important and must be balanced against the cost of limiting a minor's ability to consent. Id. Finally, the Lenz court determined that "the rationale behind third party consent involves no notion of agency. Rather, the third party consent rule recognizes that sharing space with another lessens the expectation of privacy in that space. This compromise of the expectation of privacy is no less the case for a minor co-occupant

_____

1. See, Davis v. United States, 327 F.2d 301 (9th Cir. 1969)(Court permitted an arrest where police asked an eight-year old child for permission to enter to speak to a parent then inside the home, where police saw marijuana in plain sight upon entering the home and based the arrest on this observation); Doyle v. State, 633 P.2d 306 (Alaska App. 1981)(holding that a child who appeared to be between the ages of 11 and 14 could give consent in a situation where the officers asked not for permission to search but only to speak to a parent who was found in the living room of the house, a common area.); State v. Lotton, 527 N.W.2d 840, 844 (Minn.App.1995) (a ten-year old child contacted police to inform them of drugs found in her apartment and then led police into the apartment, where the police received permission to search from the child's mother who was home at the time of the entry). See also, Murphy v. State, 355 So.2d 1153 (Ala.Crim.App. 1978)(holding that a 12-year old victim of a sexual assault could consent to a search, where her 22-year old sibling had already consented in writing); State v. Folkens, 281 N.W.2d 1 (Iowa 1979)(holding that a 14-year old rape victim could consent to a police search of her home).

–9–

than for an adult." Lenz, 51 F.3d at 1549.

Obviously, consent searches are important and the threat of coercion may be addressed at places in the consent analysis other than the discussion of authority. These conclusions only justify not barring all consent by minors, however; they do not warrant a holding that minority can never be a determining factor in finding that no authority to consent exists. Further, the Lenz court's conclusions regarding the expectation of privacy and a child's understanding of that expectation are not persuasive. The issue is not if a child understands her own rights, but if a child understands the consequences of not vindicating the right to privacy held by the child's parents or older siblings.[2] The court must consider if it is appropriate to permit a child, living in a home by virtue of an involuntary dependent relationship, to bind the rights of parents or older siblings. The key question is whether the parents and siblings have anticipated and accepted the binding, not if the child can bind. The Lenz analysis does not clearly address this distinction.

Although the Lenz court seemingly concludes that parents compromise their expectation of privacy simply by having children, this court does not reach the same result. The California Supreme Court provides a more persuasive analysis of this issue in Jacobs when it reasons that "[a]lthough parents may choose to grant their minor children joint access and mutual use of the home, parents normally retain control of the home as well as the power to rescind the authority they have given." Jacobs, 43 Cal.3d at 482. It is not reasonable or realistic to assume that an eleven-year old child, home alone, has always been authorized to act as an independent co-tenant, such that the parents should be on notice that their

_____

2. This decision assumes that a minor child under 12-years of age is more susceptible to coercion, even inadvertent coercion, than an older child.

expectation of privacy is compromised. The factual record must show some clear sign that the child had responsibility for the home and the property the police desired to search.

Any assessment of the risk that parents have assumed must also consider the likelihood that young minors may be coerced by the presence of numerous authority figures such as police officers. Even when a child has some authority over the home, that authority is nearly always circumscribed to greater or lesser degree, and the presence of a police officer can easily influence a child, especially one as young as eleven, to overstep the limits set by her parents. The lack of a "trusted non-governmental adult figure" to guide a child in making the consent decision is a critical factor in determining whether consent was voluntary, and the absence of such a figure when a young child is involved should be considered a serious defect in the consent. See, United States v. Barkovitz, 29 F.Supp.2d 411, 413 (E.D.Mich. 1998) (holding that a "small, scared"12-year old boy, home alone, could not give consent to a police search of his entire house, including his father's bedroom.) A child is much more likely to merely acquiesce to a claim of authority than to make an independent and informed decision, especially when the parents are not home and the police officers arrived unexpectedly and in the midst of an investigation. The authority of the child to consent must consider the degree to which the particular child is likely to be overwhelmed by the police and not properly consider the limits set on her authority by her parents.

Defendants in this case argue that an eleven-year old girl (according to defendants' own observations she was only ten years old) had actual authority to permit the police to enter her parents' home and search the bedrooms and closets of her parents and older siblings. Further, police assert that it was reasonable for the police to believe that Regina had this authority, even if it did not actually exist. Defendants' contentions are not persuasive. The

-11-

record does not show that Regina had responsibility for her home or that she had permission to access the private areas searched by police. There is nothing to support the argument that Regina had a substantial interest in any space investigated by the defendants. Finally, the record lacks evidence that might justify the defendants' assertion that the Abdellas shared control of their home with Regina such that they had assumed the risk she might permit the police to search it. Regina had limited permission to be home alone and no authority over the Abdella home. There are factual issues regarding her actual access to the searched property and no basis exists for a conclusion that she had common authority over her home.

The possible impact of coercion on Regina also precludes a grant of summary judgment in favor of the defendants. Regina was obviously young and scared and she was hardly in an appropriate position to object to the police activity or rationally consider her options other than acquiescence. Drawing the facts and inferences in the light most favorable to Regina, the court finds that numerous police officers surrounded her, uninvited, in her kitchen, leaving her little choice but to accede to their requests. Further, the police failed to spell out for her the extent of their plan to "look around" which involved searching inside closets and private spaces that it is highly unlikely a child as young as Regina would have permission to enter on her own. Regina, as a minor permitted to be home alone for only a short period of time, did not have unlimited authority to permit a search of the home, even if she may have had some authority and the failure of the defendants to explain what consent they were requesting made it impossible for Regina to assess her own authority before responding. Summary judgment for the second floor search is denied as there are genuine issues of fact regarding Regina's actual authority to consent.

This analysis applies equally to any claim of apparent authority that defendants might

raise. The Supreme Court has determined that the issue raised when police claim that the consenting party had apparent authority to permit the challenged search is not whether the non-consenting party has waived her rights by association with the third-party, but rather whether it is unreasonable for the police to search based on the third party's consent. Rodriguez, 497 U.S. at 187. There is no basis in the record for a holding that the police were reasonable in thinking that a minor possibly as young as ten years old could have authority to consent to a broad search of her parent's home. Regina was not babysitting younger siblings or in any way obviously in a position of responsibility in the home. The defendants were concerned enough about Regina's youth to request that she call an older sibling, but they chose not to wait for the older and more responsible party to arrive before requesting permission to search. Inferring the facts in a light favorable to the plaintiffs, the court could conclude that the officers chose to exploit a window of opportunity when they requested Regina's permission to search the second floor. At least, the record is sufficient to deny summary judgment based on a claim that the search was reasonable and justified by the defendants belief in Regina's apparent authority to consent.

      Finally, there are clear issues of fact related to the voluntariness of Regina's consent. The facts, taken in her favor, show a young girl surrounded by a large and unwanted police presence. It is impossible to infer that her consent was purely voluntary and not at all coerced or pressured by the sheer volume of police officers in the Abdella home. Summary judgment cannot be granted on the grounds that the consent was voluntary.

      There are genuine issues of material fact regarding Regina's consent for defendants to enter the Abdella home and so summary judgment is denied. Further, the evidence regarding the assumption of risk by Regina's parents that she would consent to a search of the Abdella

home is insufficient to support summary judgment for defendants. Nor does the evidence permit the court to hold that defendants' assumptions regarding Regina's apparent authority to consent was reasonable. Finally, the facts are very much in doubt as to whether her consent was voluntary, assuming that she did have authority to consent. The motion for summary judgment is denied as to consent.

###    b.    Exigent Circumstances

Defendants O'Toole and Bette claim that even if they did not have consent to enter or search the home, they had an alternative probable cause that justified their entry. Officer O'Toole claims that, based on the totality of the circumstances, he was concerned for Regina's health and safety when he learned that she was home alone. Defendants argue that O'Toole's knowledge that Jim was likely to be in the house and was wanted for theft, coupled with Bette's awareness of Jim's history of physical aggression, mood swings and crisis counseling, justified their conclusion that Regina was not safe while alone in her own home.

Although a warrantless search is *per se* unreasonable, it can be justified "where exigent circumstances demand that law enforcement agents act without delay." United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990)(en banc), *cert. denied*, 498 U.S. 1119 (1991). Probable cause is not sufficient to justify a warrantless search. Kirk v. Louisiana, 536 U.S. 635 (2002). "Absent exigent circumstances, the firm line at the entrance to the house may not reasonably be crossed without a warrant." Kirk, 536 U.S. at 636 (quoting Payton v. New York, 445 U.S. 573, 590 (1980)). "[T]he exigent circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense…has been committed." Welsh v. Wisconsin, 466 U.S. 740, 753 (1984).

The test for determining exigent circumstances is an objective one that turns on the totality of the circumstances confronting law enforcement agents in a particular case. MacDonald, 916 F.2d at 769. The Second Circuit has adopted the analysis used in Dorman v. United States, 435 F.2d 385 (D.C.Cir. 1970)(en banc). Dorman outlines six factors that should be considered when determining the existence of exigent circumstances. The factors are: (1) the gravity or violent nature of the offense the suspect allegedly committed; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause that the suspect committed the crime; (4) strong reason to believe the suspect is in the premises being entered; (5) a likelihood the suspect will escape if not swiftly captured; and (6) the peaceful circumstances of the entry. MacDonald, 916 F.2d at 769-770. Also, a reasonable belief by law enforcement officials that the targets of an investigation are armed or that quick action is necessary to prevent the destruction of evidence can serve to show exigent circumstances. United States v. Brown, 52 F.3d 415, 421 (2d Cir. 1995). Further "[a]lthough the existence of probable cause and knowledge that the suspect is on the premises are important predicates to a finding that an entry was justified based on exigent circumstances, they are not sufficient to justify an entry where the crime involved is minor and there is no apparent potential for violence." Loria v. Gorman, 306 F.3d 1271, 1285-86 (2d Cir. 2002). These factors are "not intended as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account" MacDonald, 916 F.2d at 770.

Resolving all facts and inferences in favor of the non-moving party as required, the court finds that the defendants have not met their burden of showing that no genuine issues of material fact exist. The record shows that the offense Jim allegedly committed was minor and non-violent and that the only witness to identify Jim affirmatively told police that he did not

steal anything. The police had no reason to believe that Jim was armed or that he would elude

custody if not rapidly apprehended. Further, the plaintiffs' facts show that Jim stole nothing,

so there was no reason for police to think that evidence had been destroyed. A reasonable jury

could easily conclude that no exigent circumstances existed to justify a warrantless search of

the Abdella home.

Defendants do raise the issue of Regina's safety, but the record does not support their

claim. The facts, taken in the most favorable light for the Abdellas, do not support a

reasonable conclusion by O'Toole or Bette that there was an "apparent potential" for violence

by Jim against Regina. She told police that she was home alone and there was no evidence

that her brother was threatening her safety or ever had done so. Regina gave no indication that

she felt endangered or in need of aid. A jury could decide that there was no objectively

reasonable basis for O'Toole or Bette to think that Regina was in sufficient danger to justify

the entry and search. Summary judgment is denied.


    **c.**    **Emotional Distress**

Plaintiff Abdella also seeks damages under Connecticut state law for the infliction of

"severe" emotional distress. Defendants seek summary judgment on the grounds that the facts

do not support an emotional distress claim. Connecticut law recognizes claims for both the

intentional infliction of emotional distress and the negligent infliction of emotional distress.

Plaintiffs fail to articulate which claim they seek to vindicate in the present action, so both

possible claims will be considered.

The Connecticut Supreme Court has stated that, in order to recover damages on a

claim of intentional infliction of emotional distress, the plaintiff must show:

> (1) that the actor intended to inflict emotional distress; or that he knew or
> should have known that emotional distress was a likely result of his conduct;
> (2) that the conduct was extreme and outrageous; (3) that the defendant's
> conduct was the cause of the plaintiff's distress and (4) that the emotional
> distress sustained by the plaintiff was severe.

Peytan v. Ellis, 200 Conn. 243, 253 (1986). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." Appleton v. Board of Educ. of Town of Stonington, 254 Conn. 205, 210 (2000). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. at 210-11 (citing 1 Restatement (Second) of Torts § 46, comment (d) (1965)). The conduct must be of a "nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." Ancona v. Manafort Bros., Inc., 56 Conn.App. 701, 746 (2000).

The facts of this case do not support a claim of intentional infliction of emotional distress. The facts, taken in the light most favorable to the plaintiff, show multiple police officers acting without proper legal justification to enter and search the Abdella home in an effort to find Jim. The officers behaved in a polite fashion and did not threaten or abuse Regina. There is no evidence that any member of the Abdella family has suffered severe mental or emotional distress. A police search, legal or not, is likely to unnerve or distress most people, but an intentional infliction of emotional distress claim requires some showing of an intent to cause emotional harm. Arguably, the officers illegally searched inside private closets and drawers in their search for the allegedly stolen beer. There is no evidence of an intent to cause emotional harm or of actions so beyond the bounds of common decency that the court will find them legally intolerable. The police were engaged in a search and even based on the

plaintiffs' facts, that search was conducted in a fairly typical, though legally unjustified, fashion. Summary judgment is granted as to a claim for the intentional infliction of emotional distress.

It is possible that the plaintiffs seek only to show that the defendants negligently inflicted emotional distress. A person may be liable for negligent infliction of emotional distress in Connecticut if he should have realized that his conduct "involved an unreasonable risk of causing emotional distress and that that distress, if it was caused, might result in illness or bodily harm." Montinieri v. Southern New England Telephone Co., 175 Conn. 337, 345 (1978).

There is no evidence in this case that the actions of the defendants caused the plaintiffs to suffer illness or bodily harm. Plaintiffs allege that they are worried, depressed, unhappy in their community and that they have lost trust in the police. Any police activity may reasonably result in exactly the type of response described by the plaintiffs, regardless of its legality. As unfortunate as these experiences are, the court cannot conclude that a police search involves an unreasonable risk of such distress, or that the distress alleged by plaintiffs is so severe as to cause illness or bodily harm without some proof of such harm, and the record is devoid of sufficient proof on this point. Summary judgment is granted on any claims of negligent infliction of emotional distress.

## III.    MOTION OF DEFENDANT FROEHLICH

Defendant Joseph Froehlich motions for summary judgment on the grounds that his entry and search of the Abdella home was based on the consent of Regina Abdella and was therefore constitutional. Alternately, Froehlich argues that he is entitled to qualified immunity.

The substantive issues raised by Froehlich's motion for summary judgment are identical to those raised by O'Toole and Bette on the issues of consent to enter and search and emotional distress. Froehlich does not claim a defense of exigent circumstances. There are material issues of fact regarding Regina's consent to enter and her actual authority to consent to Froehlich's search. Further, the facts do not support a holding that his conclusion regarding Regina's apparent authority was reasonable. Thus, with regard to the merits of Froehlich's motion, summary judgment is denied as to the entry and search and granted as to the claims of emotional distress. The court will now consider the issue of qualified immunity.

## IV.    QUALIFIED IMMUNITY

All three defendants in this case argue that they are entitled to qualified immunity based on their actions.  "Qualified immunity is a difficult concept; it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct." Stephenson v. Doe, 332 F.3d 68, 80 at fn.15 (2d.Cir. 2003). "The privilege is an immunity from suit rather than a mere defense to liability." Saucier v. Katz, 533 U.S. 194, 200-201 (2001).

The Supreme Court has refined the standard applied to claims of qualified immunity. Courts must apply a three-part test that asks first whether a constitutional violation could exist on the facts as presented to the court. Saucier, 533 U.S. at 201. The facts are taken in the light most favorable to the non-moving party, when the issue is raised at the summary judgment stage. Id.

Once the court has determined whether a right could be violated on the facts, the second step is to determine if the right alleged is clearly established. Id. "The contours of the

right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." <u>Id</u>.

The third part of the inquiry is to determine if, based on the facts known to the officer at the time of events, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202. "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer" would take the actions of the defendant. <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). If "officers of reasonable competence could disagree," however, then "immunity should be recognized." <u>Id</u>.

The court has already determined that a constitutional violation can exist on the facts of this case, taken in the light most favorable to the plaintiff. The second part of the <u>Saucier</u> test seeks to resolve whether the law was clearly established. Here, the defendants knew, without any doubt, that a warrantless search is unconstitutional unless a valid exception applies. Further, the defendants knew that there was no warrant for the search of the Abdella home. The law is unquestionably settled.

The third question posed by the qualified immunity test is whether the officers made a reasonable mistake as to what the law requires. This standard will be applied to defendants O'Toole and Bette collectively[3] and then to Froehlich as an individual.

---

3. Defendants O'Toole and Bette raise the issue of qualified immunity, but do not brief it and offer the court no analysis of how the law applies to their case, either as individuals or collectively. The court will nonetheless consider the question of whether O'Toole and Bette are entitled to qualified immunity on the facts presented, but it will assume that both defendants would make the same arguments on the same facts and treat them accordingly.

a.     **Defendants O'Toole and Bette**

O'Toole and Bette are not entitled to qualified immunity based on their claim of consent to enter and search. When "genuine, material, factual disputes overlap…qualified immunity must be denied." Cowan v. Breen, 352 F.3d 756, 764 (2d Cir. 2003). Here, the issue is whether it was reasonable for O'Toole and Bette to believe that their entry and search were lawful based on the consent of Regina Abdella. The facts presented by the plaintiff make clear that a reasonable officer would have known that he did not have consent and, further, would have understood entry without consent to be legally unreasonable. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341. Here, there is a genuine issue of material fact regarding whether the defendants knowingly violated the law and thus qualified immunity is inappropriate. Summary judgment is denied.

O'Toole and Bette also claim qualified immunity for any damages arising out of the second floor search. Arguably, O'Toole and Bette could have believed that Regina Abdella had the authority to consent and that she did, in fact, consent to the search. The court finds that such a belief would be unreasonable on the facts taken most favorably to the plaintiff. No reasonable officer would conclude that an eleven-year old girl could consent to a broad search of her parents' home and personal possessions. A reasonable officer would have understood that Regina's ability to consent to a search of her parents' home was limited in scope, if it even existed. Assuming that Regina had some level of authority, the failure of police to explain the scope of their search, in light of the danger of coercion, makes their assumption of broad authority unreasonable. A reasonable officer would have waited until someone with more obvious authority to consent arrived at the home. Again, the facts taken most favorably

to the plaintiffs suggest that defendants consciously exploited Regina's youth. Such actions are not reasonable and are not entitled to qualified immunity.

The reasonableness of defendants belief that Regina's consent was legally volunatry is also doubtful. A young girl, faced with the unwanted and uninvited intrusion of multiple police officers much older and larger than she, is far too vulnerable to coercion for a reasonable officer to consider her consent voluntary. At best, the facts show "acquiescence to lawful authority," and this is insufficient to show voluntary consent. Schenckloth, 412 U.S. at 233. Plaintiffs' facts show that the officers had no basis for conducting the search and that Regina was home alone and too young to be able to permit strangers to search in the closets and bedrooms of her home. These factors would lead a reasonable officer to conclude that no valid consent was given. Qualified immunity cannot be granted at this time

Defendants also claim qualified immunity based on the existence of exigent circumstances. This court finds it impossible to grant qualified immunity on that ground. It is already established that, taking the facts in the light most favorable to the plaintiff, it would be reasonable to conclude that no exigent circumstances existed. The court now goes one step further and concludes that the plaintiff's facts would not permit a reasonable officer to conclude that his entry into the Abdella home and subsequent search were reasonable without a warrant.

O'Toole and Bette, according to the plaintiff, knew that Jim, a teenager suspected of having stolen a case of beer, had recently been inside the Abdella home but was not at the time of their arrival. The facts show a non-violent crime, a non-violent suspect, and little reason to think that the suspect was present or likely to evade capture if not immediately apprehended. A reasonable officer would conclude that none of the proofs necessary to show

exigent circumstances are present on these facts. Further, although the officers did know that Jim had previously experienced emotional difficulties and had received crisis counseling, there is no basis in the record for a reasonable officer to conclude that Regina might have been in danger on July 18, 2001. O'Toole and Bette point to no evidence that Jim was armed or that they had knowledge of any threats or actions he had ever taken or contemplated against his sister. Indeed, the plaintiffs' facts show that Jim Abdella was not actually present in the house and that the defendants knew this. The facts taken in the light most favorable to the plaintiff show that it was wholly unreasonable for the officers to think that exigent circumstances existed to justify the warrantless search. Qualified immunity based on exigent circumstances is denied.

### b.    Defendant Froehlich

Defendant Froehlich claims that he is entitled to qualified immunity for his entry and search of the Abdella home. He argues that he arrived after O'Toole and Bette entered the Abdella home and that it was reasonable for him to believe that his fellow officers had obtained consent prior to their entry and so his own entry based on that assumption is reasonable. Further, Froehlich states that he heard Regina give consent to the search of the home and that his belief in the lawfulness of that consent was reasonable.  The court does not accept that Froehlich may justify his own unconstitutional entry by a showing that another officer acted unconstitutionally first, but this is not his contention. Rather, Froehlich claims that he inferred the existence of a valid consent for his own entry from the totality of the circumstances, including the presence of O'Toole inside the house.

The court finds that a genuine issue of material fact exists that precludes a grant of qualified immunity at this stage of the proceedings. Froehlich's claim is based on his assertion

that he arrived at the Abdella home after the other defendants were inside with Regina.

Plaintiff's facts do not contradict this, but O'Toole's statements create a genuine issue of fact

on this point. O'Toole declares that Froehlich was with him at the time he asked for and

received Regina Abdella's consent. Plaintiffs contend that O'Toole never received consent.

Drawing all inferences in plaintiff's favor, it would be possible for a jury to conclude that

Froehlich was present at the time of O'Toole's entry and that he knew O'Toole lacked

consent. Under such conditions Froehlich's entry would be knowingly unlawful and qualified

immunity would be inappropriate. Similarly, the court's prior analysis of the consent to search

the second floor prevents a grant of qualified immunity on that ground. The facts known to

Froehlich would not lead a reasonable officer to conclude either that the search was

constitutional or that Regina's consent was voluntary.


## **CONCLUSION**

_____All three defendants are denied summary judgment on the merits of the constitutional

claims. Further, taking the facts in the light most favorable to the plaintiffs' the court finds

that no reasonable police officer could have believed that the actions of the three defendants,

either regarding the entry or the search, were legal. Summary judgment based on qualified

immunity is denied. Finally, plaintiffs have failed to show genuine issues of fact sufficient to

support either a claim for intentional infliction of emotional distress or a claim for negligent

infliction of emotional distress under Connecticut law. All defendants are granted summary

judgment as to any such claims under Connecticut law.

This case is referred to the Hon. Thomas P. Smith, United States Magistrate Judge, for

a settlement conference. The parties are **ORDERED** to submit a joint trial memorandum on

or before December 15, 2004.

**IT IS SO ORDERED** at Hartford, Connecticut, this __29th__ day of October, 2004.

                                   _____/s/DJS_____
                                   **DOMINIC J. SQUATRITO**
                                   **UNITED STATES DISTRICT JUDGE**